# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **KELLY LLOYD,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action Number |
| ) | **2:11-cv-3118-AKK** |
| **MICHAEL J. ASTRUE,** ) | |
| **COMMISSIONER OF SOCIAL** ) | |
| **SECURITY** ) | |
| **ADMINISTRATION,** ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Plaintiff Kelly Lloyd ("Lloyd") brings this action pursuant to Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking review of the final adverse decision of the Commissioner of the Social Security Administration ("SSA"). This court finds that the Administrative Law Judge's ("ALJ") decision - which has become the decision of the Commissioner - is supported by substantial evidence and, therefore, **AFFIRMS** the decision denying benefits.

### I. Procedural History

Lloyd filed her application for Title XVI Supplemental Security Insurance on March 27, 2009, alleging a disability onset date of December 23, 2007, from

"nerve damage in neck vertebrae" and a brain aneurism. (R. 50, 186). After the SSA denied her application, Lloyd requested a hearing before an ALJ. (R. 67, 76-82). The ALJ subsequently denied Lloyd's claim, which became the final decision of the Commissioner when the Appeals Council refused to grant review. (R. 1-4, 51). Lloyd then filed this action for judicial review pursuant to § 205(g) and § 1631(c)(3) of the Act, 42 U.S.C. § 405(g) and § 1383(c)(3). Doc. 1.

## II.  Standard of Review

The only issues before this court are whether the record contains substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the ALJ applied the correct legal standards, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is "reasonable and supported by substantial evidence." *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 849 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the court must affirm the Commissioner's factual findings even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, it notes that the review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

### III.  Statutory and Regulatory Framework

To qualify for disability benefits, a claimant must show "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairments which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

Determination of disability under the Act requires a five step analysis.

20 C.F.R. § 404.1520(a)-(f). Specifically, the Commissioner must determine in sequence:

(1) whether the claimant is currently unemployed;

(2) whether the claimant has a severe impairment;

(3) whether the impairment meets or equals one listed by the Secretary;

(4) whether the claimant is unable to perform his or her past work; and

(5) whether the claimant is unable to perform any work in the national economy.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of 'not disabled.'" *Id*. at 1030 (citing 20 C.F.R. § 416.920(a)-(f)). "Once a finding is made that a claimant cannot return to prior work the burden shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted).

Lastly, where, as here, Lloyd alleges disability because of pain, she must meet additional criteria. In this circuit, "a three part 'pain standard' [is applied] when a claimant seeks to establish disability through his or her own testimony of pain or other subjective symptoms." *Holt v. Barnhart*, 921 F.2d 1221, 1223 (11th

Cir. 1991). Specifically,

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.[1]

*Id.* However, medical evidence of pain itself, or of its intensity, is not required:

> While both the regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, <u>neither requires objective proof of the pain itself</u>. Thus under both the regulations and the first (objectively identifiable condition) and third (reasonably expected to cause pain alleged) parts of the *Hand* standard <u>a claimant who can show that his condition could reasonably be expected to give rise to the pain he alleges has established a claim of disability and is not required to produce additional, objective proof of the pain itself</u>. *See* 20 CFR §§ 404.1529 and 416.929; *Hale* at 1011.

*Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1215 (11th Cir. 1991) (parenthetical information omitted) (emphasis added). Moreover, "[a] claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223. Therefore, if a claimant testifies to disabling pain and satisfies the three part pain standard, the ALJ must find him disabled unless the ALJ properly discredits his testimony.

Furthermore, when the ALJ fails to credit a claimant's pain testimony, the

---

[1] This standard is referred to as the *Hand* standard, named after *Hand v. Heckler*, 761 F.2d 1545, 1548 (11th Cir. 1985).

ALJ must articulate reasons for that decision:

> It is established in this circuit that if the [ALJ] fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the [ALJ], as a matter of law, has accepted that testimony as true. Implicit in this rule is the requirement that such articulation of reasons by the [ALJ] be supported by substantial evidence.

*Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987). Therefore, if the ALJ either fails to articulate reasons for refusing to credit the plaintiff's pain testimony, or if the ALJ's reasons are not supported by substantial evidence, the court must accept as true the pain testimony of the plaintiff and render a finding of disability. *Id*.

### IV.  The ALJ's Decision

In performing the sequential analysis, the ALJ initially determined that Lloyd had not engaged in substantial gainful activity since her application date and therefore met Step One. (R. 56). Next, the ALJ acknowledged that Lloyd's severe impairments of "cervical degenerative disc disease, anxiety disorder, rotator cuff tear and tendinitis of the right upper extremity, chronic pain disorder, and a history of a cerebral aneurism" met Step Two. *Id*. The ALJ then proceeded to the next step and found that Lloyd did not satisfy Step Three since she "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id*. Although the ALJ answered Step Three in the negative, consistent with the law,

*see McDaniel*, 800 F.2d at 1030, the ALJ proceeded to Step Four, where he determined that Lloyd has the residual functional capacity ("RFC") to

> perform the full range of sedentary work as defined in 20 CFR 416.967(a); with the following mental limitations: the claimant has moderate pain and psychological impairments, as well as moderate symptoms of dizziness, weakness and medicinal side effects, which cause no more than a moderate affect on her ability to maintain adequate concentration, attention and pace.

(R. 58). The ALJ further found that Lloyd's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent" with her RFC. (R. 60). In light of Lloyd's RFC, the ALJ determined that Lloyd was "unable to perform any past relevant work." (R. 60). The ALJ then proceeded to Step Five where he considered Lloyd's age, education, experience, and RFC, and determined that there are "jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 61). Consequently, the ALJ determined that Lloyd is not disabled. (R. 62); *see also McDaniel*, 800 F.2d at 1030.

## V. Analysis

Lloyd contends that the ALJ erred by purportedly failing to consider Lloyd's "non-exertional impairments particularly her pain, which is well documented throughout her medical records both following the [motor vehicle

accident], and later due to residuals from the [motor vehicle accident] which have progressed through time." Doc. 8 at 12, 14. As shown below, the ALJ's decision is supported by substantial evidence.

A.   *The Medical Evidence*

Lloyd's pain emanated from a motor vehicle accident that she sustained in December 2007. Doc. 8 at 4; (R. 40, 58). Four days after the accident, Lloyd visited Dr. Lora Pound at Baptist Health Centers Trussville complaining of back, neck, head, and right shoulder pain. (R. 327). Ten days later, Lloyd visited St. Vincent's Hospital East's emergency room with head, neck, and upper back pain and decreased range of motion and spasms in her neck. (R. 305). Lloyd's head x-rays revealed "no acute intracranial process" and a cervical spine CT scan was negative. (R. 312-313). The treating physician diagnosed Lloyd with thoracic neck strain and concussion without loss of consciousness, prescribed Dilaudid and Zofran, and discharged Lloyd in "improved" condition. (R. 305, 307, 309).

In April 2008, Lloyd visited the Alabama Neurological Institute for "significant pain in various parts of her body including her head, neck, right shoulder" and "difficulties with thinking clearly and actually feeling back to her normal self." (R. 249). Dr. Camilo Gomez observed normal reflexes, coordination, pulses, and gait, diagnosed Lloyd with possible vertebral/carotid

artery dissection, cervical spine ligamentous injury, and right rotator cuff injury, and prescribed Amitriptyline. (R. 250). Two weeks later, Dr. Gomez ordered magnetic resonance imaging ("MRI") tests of Lloyd's spine, head, and right shoulder. (R. 251-52, 255). The spine MRI was "consistent with posterior herniation with a transverse annular tear of the C5-6 disc," the head MRI proved negative, and the right shoulder MRI revealed "extensive tearing and erosion of the anterior and posterior glenoid labral quadrants" and "distal tendinosis and partial thickness tearing of the supraspinatus tendon without retraction." *Id*. Lloyd also received an intracranial magnetic resonance angiogram ("MRA") that was "consistent with a saccular aneurism arising from the right internal carotid artery," and had a normal extracranial MRA. (R. 253-54). Dr. Gomez subsequently referred Lloyd to an orthopedic surgeon because Lloyd complained that her right shoulder was "still very painful." (R. 256-57).

Sometime thereafter, Lloyd visited Dr. Perry Savage of the Alabama Orthopedic Spine and Sports Medicine Associates for right shoulder and neck pain and numbness in her right arm. (R. 489). Dr. Savage's examination revealed normal alignment, posture, sensation, and reflexes. (R. 489). Dr. Savage recommended neck exercises and referred Lloyd to Dr. Geoffrey Connor at Alabama Orthopedic for surgical evaluation. (R. 489-490). Dr. Connor's

evaluation revealed generalized tenderness and normal range of motion, strength, and tone. (R. 490). As a result, Dr. Connor recommended "rest, ice, compression, elevation," and non-steroidal anti-inflammatory medications. (R. 491-92).

Lloyd returned to Dr. Gomez in May, June, and August 2008. (R. 258-263). The treatment notes and diagnoses remained the same, except for a Fentanyl patch prescription in August 2008. (R. 263). Two weeks later, Lloyd presented again to St. Vincent's emergency room for right shoulder pain. (R. 288). The treating physician noted Lloyd's mild discomfort, tenderness, and limited range of motion, prescribed Dilaudid and Phenergan, and discharged Lloyd in improved and stable condition. (R. 288-89, 291).

In September 2008, Lloyd again visited Dr. Pound at Orthopaedic Specialist of Alabama for right shoulder pain. (R. 322). Dr. Pound reported full range of motion in Lloyd's cervical spine with discomfort bending to the right, normal shoulder range of motion, posterior right neck pain, and occasional tingling into the ulna fingers. *Id*. Based on the April 2008 MRIs, Dr. Pound diagnosed Lloyd with a "C5-6 cervical disc and injury to the shoulder, which probably has a partial supraspinatus tear and some labral deformity." *Id*.

Orthopaedic Specialist of Alabama subsequently performed a MRI arthrogram on Lloyd's right shoulder. (R. 316). According to Dr. Stephen

Cowley, the MRI arthrogram did "not show any significant pathology. There is a little tendinosis in the distal supraspinatus. There is no disruption of it or the labrum. . . . I do not think there is anything to recommend to do for the shoulder at this point. If she has a C5 to C6 disc problem, I am going to send her to Dr. [J. Todd ] Smith [at Orthopedic Specialist of Alabama]." (R. 320). A few weeks later, Dr. Pound evaluated Lloyd again and reported a "positive Spurling's causing tingling to the right ulnar hand. She has positive Tinel's at the cubital tunnel, positive Spurling's that also causes pain in the right lateral shoulder." (R. 318). As a result, Dr. Pound diagnosed Lloyd with "cervical spondylosis, possible brachial plexus strain, and possible radiculitis." *Id*.

Lloyd last visited Orthopaedic Specialist of Alabama in December 2008 for numbness, tingling, and neck and right arm pain. (R. 317). Presumably at Dr. Cowley's suggestion, Dr. Smith examined Lloyd and reported a "positive Spurling's causing numbness and tingling and pain down the right arm," a "positive Romberg's sign," and that the right shoulder MRI showed a C5-6 right-sided paracentral disk herniation with abutment of the cord, mild compression of the cord with C6-7 right foraminal stenosis, mild right compromise, and lateral recess at C5-6. (R. 317). Dr. Smith indicated that he planned to perform a cervical diskectomy and fusion when Lloyd resolved her insurance issues. (R.

317). The record is silent on whether Lloyd underwent this procedure.

Unlike 2008, the 2009 record consists primarily of psychological consultative examinations related to Lloyd's disability claim. It includes visits to two psychologists whose reports primarily outline Lloyd's subjective complaints that she suffers from neck, arm, and shoulder pain and migraine headaches. (R. 359, 365). One of the psychologists, Dr. Leanne Cianfrini, concluded that Lloyd "appears to be a good candidate for conservative pain management" based on Lloyd's report that her pain that day rated a 6.5/10. (R. 362). The other psychologist, Dr. Sally Gordon, opined that the "information obtained in this evaluation and historical information contained in [Lloyd's] medical records suggests that her psychological issues are not likely to cause more than mild impairment in her ability to work. She should be able to learn, remember, and follow through on work instructions. She should be able to maintain amicable relationships with coworkers and supervisors." (R. 367). The ALJ also obtained a psychiatric review that revealed anxiety and pain disorders associated with a generalized medical condition that causes mild restriction of activities of daily living, mild difficulties maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 383, 388-89, 393). Finally, Lloyd also visited Dr. Daniel Doley at the Doleys Clinic in July, September,

October, and December 2009 for actual treatment for her alleged pain. (R. 404, 406, 408, 410). However, only the December treatment notes, which read that Lloyd was "pleased [with the] current regimen," are legible. (R. 404).

There are four treatment entries in 2010, beginning in July when Lloyd returned to the Doleys Clinic. (R. 487). Dr. William Lupinacci evaluated Lloyd for chronic neck and shoulder pain and noted that Lloyd's pain "has been fairly well under control with her current medication. She doesn't wish to change that." *Id*. Consequently, Dr. Lupinacci refilled Lloyd's prescriptions and arranged for a neurological consultation for Lloyd's aneurism diagnosis. *Id*.

The next entry occurred in October when Dr. Colby Maher of St. Vincent's evaluated Lloyd due to difficulty concentrating, headaches, and changes in vision. (R. 443). Dr. Maher ordered a cerebral angiogram that revealed "evidence of a hemodynamically significant stenosis at the origin of the right internal carotid artery" that "does not confirm the presence of an A2 segment anterior cerebral artery aneurysm." (R. 450). The next day, Dr. Christopher Hill of the Doleys Clinic evaluated Lloyd for chronic neck and shoulder pain and reported Lloyd's "current pain as 2/10, lowest pain over the last week at 0/10, highest 6/10 and the average pain as 2/10. The patient's pain is improved 90% on the current treatment plan." (R. 484). The final 2010 medical entry occurred in November when Dr.

William Harvey of St. Vincent's performed a right carotid endarterectomy with patch angioplasty to treat Lloyd's right carotid stenosis. (R. 472). There are no post-operative treatment notes in the record.

B.   *The Pain Standard*

After reviewing the medical record, the ALJ determined that Lloyd met the first prong of the pain standard because she was "diagnosed with the various conditions that she has alleged." (R. 58). However, the ALJ found that Lloyd failed to meet the second prong because "the medical evidence of record does not confirm the alleged severity of the claimant's various conditions." *Id*. According to the ALJ,

> [t]here is sufficient objective medical evidence to determine that the claimant has some degree of limitation resulting from her diagnosed conditions; however, her limitations are not such that they would prevent the claimant from performing all competitive work. The claimant simply alleges a greater degree of disability than what objective medical evidence can support. A limitation to sedentary jobs, with other adequate work limitations, is therefore warranted, and this has been appropriately accounted for with the [RFC] as determined by the undersigned herein.
>
> In reaching this conclusion, the findings and opinions of Dr. Gordon, Dr. Estock, Dr. Shomento,[2] and Dr. Chastain,[3] have been considered

---

[2] Consultative examiner Dr. Stacy Shomento evaluated Lloyd for neck and shoulder pain and an aneurism. (R. 369). Dr. Shomento reported that Lloyd has a normal gait, can heel-to-toe walk, and an "inability to move further than 10%" in the cervical region of her back. (R. 371-72). After reviewing Lloyd's laboratory test results, Dr. Shomento opined that Lloyd "has essentially a normal physical exam with the exception of some limited range of motion at the

and are given substantial weight. All of these doctors are deemed by regulation to be 'highly qualified experts in Social Security disability evaluation' (20 CFR 416.927(f)(2)(I)). Their findings and opinions are uncontradicted by other objective medical evidence. All of these doctors had access to the claimant's entire medical record at the time of their assessment or review. Additionally, no treating source physician or health care professional ever stated that the claimant was impaired or ascribed any functional limitations to the claimant beyond the [RFC] as determined by the undersigned herein.

(R. 60).

Lloyd challenges the ALJ's findings and contends that she meets the pain standard. Based on the record, the court finds that Lloyd fails to meet the pain standard, in part, because the objective medical evidence shows primarily mild impairments that are not reasonably expected to produce disabling pain. *Holt*, 921 F.2d at 1223. For example, with respect to Lloyd's contention that her stenosis causes impaired vision and forgetfulness, the record shows that Dr. Maher

---

cervical spine and right shoulder," and diagnosed Lloyd with "chronic neck pain and right shoulder pain following a [motor vehicle accident] . . . with MRI evidence of herniated disc at C5-C6," right shoulder pain and tendinitis, arm pain "some of which may be radiculopathy," and a small secular aneurism "with normal neurological evaluation." (R. 373).

[3]Dr. Samuel Chastain completed a Physical Residual Functional Capacity Assessment in which he opined that Lloyd can (1) occasionally lift or carry ten pounds, (2) frequently lift or carry less than ten pounds, (3) stand, walk, or sit six hours in an eight hour workday, (4) push and/or pull on a limited basis using upper extremities, (5) frequently climb stairs, balance, stoop, kneel, and crouch, (6) never climb ladders, ropes, or scaffolds, and (7) occasionally crawl. (R. 375-377). Critically, while Dr. Chastain opined that the "[medically determinable impairments] cervical spondylosis and tendinitis could reasonably expect to produce some of [the] alleged symptoms and functional limitations accounted for in this RFC," he added that Lloyd's "allegations [are] accepted as partially credible but MER, imaging, and exams do not support [the] degree of limitations as alleged." (R. 380).

corrected Lloyd's carotid stenosis and there are no post-operative treatment notes regarding this purported impairment. (R. 35, 59, 472). To the extent that Lloyd contends that the surgery failed to correct the stenosis, she failed to provide any evidence to support her contention. Likewise, Lloyd's x-rays and MRI of the head, CT of the head and spine, extracranial MRA, and MRI arthrogram of the shoulder, which proved negative, (R. 312, 315, 357), are inconsistent with her allegations of disabling pain as related to her neck and shoulder pain and aneurism. Moreover, while the record shows disc herniation at C5-6, as the ALJ pointed out, no physician found this issue to rise to the level of pain Lloyd describes or opined that Lloyd has disabling pain. (R. 60). In fact, Dr. Smith described only "mild compression" with stenosis and "mild" right compromise, (R. 317), Dr. Pound diagnosed a "partial supraspinatus tear and some labral deformity," (R. 322), and Dr. Shomento described simply a disc herniation at C5 with some "limited" range of motion in her cervical spine, (R. 59, 373). In other words, consistent with Dr. Chastain's opinion, the court finds that objective tests and exams fail to support the degree of limitations Lloyd alleged.[4] (R. 59, 380).

---

[4] Even the psychological examinations do not support Lloyd's contentions. Specifically, as related to Lloyd's non-exertional mental limitations, consistent with the ALJ's findings, Dr. Gordon opined that Lloyd had average concentration and attention and only "mild" mental impairments that would not prevent her from engaging in competitive work, and Dr. Estock reported that Lloyd's pain and anxiety disorder would cause only moderate difficulty in maintaining concentration, persistence, and pace. (R. 57, 59, 367, 393, 397-98).

Lloyd also fails to meet the pain standard because her testimony that her treatment regimen proved effective belies her contention that she suffers from disabling pain. As the ALJ correctly observed, Lloyd testified and reported to Drs. Lupinacci and Hill that her pain was controlled with medication and rated a 2/10, which Lloyd admitted to Dr. Cianfrini was "tolerable on [a] steady basis." (R. 37, 59, 362, 484, 487). By Lloyd's own testimony, she does not suffer from disabling pain.

Finally, Lloyd also fails to meet the pain standard because substantial evidence supports the ALJ's finding that Lloyd is not credible. (R. 60). Specifically, Lloyd testified that her medications cause dizziness, problems with concentration, and require her to lay down and take a nap. (R. 37, 44). Yet, as the ALJ pointed out, Lloyd informed Dr. Hill that she was not having problems with drowsiness or concentration. (R. 484). Also, Lloyd testified that she does not drive in part due to neck pain, yet told Dr. Cianfrini that she does not drive due to a fear of an arrest for DUI. (R. 36, 59, 359-362). These discrepancies in Lloyd's testimony and her demeanor at the hearing, which the ALJ had the benefit of observing, (R. 25), are sufficient to support the ALJ's determination that Lloyd is not disabled.

## VI.  Conclusion

Based on this court's review of the entire record, the ALJ's finding that the medical evidence fails to confirm the alleged severity of Lloyd's impairments is supported by substantial evidence.  (R. 58).  Accordingly, the court concludes that the ALJ applied proper legal standards in reaching this determination.  The final decision of the Commissioner is, therefore, **AFFIRMED**.  A separate order in accordance with this memorandum of decision will be entered.

Done the 26th day of November, 2012.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE